# CASES DETERMINED

DETERMINED IN THE

# SUPREME COURT of JUDICATURE

OF THE

## STATE OF NEW JERSEY

AT FEBRUARY TERM, 1858.

---

THE STATE, THE MORRIS CANAL AND BANKING COM-
PANY, prosecutors, *vs.* ALBERT N. BROWN.

1. To entitle the owner of land to a license to build docks and wharves, he must be the owner of the land above and adjoining the edge of the water at ordinary high water.

2. Where land is described as lying in the vicinity of, and on the margin of a bay, it is considered a boundary on the bay, and includes the shore ownership.

3. Where a license to build docks and wharves is applied for, the applicant, to entitle him to the license, must show affirmatively that he is the shore-owner; but it is not necessary that such ownership should be an unqualified fee.

4. A deed was made to the Morris Canal and Banking Company, conveying all the interest and estate of the grantor in the land and appurtenances to their only proper use, benefit, and behoof, "as long as used for a canal." *Held*, that while the estate continues, and until the qualification upon which it is limited is at an end, the grantees have the same rights and privileges over the estate as if it were a fee simple.

5. Where a corporation are empowered, by their charter, to acquire real estate by deed or gift, without limitation in point of estate, they have a right to accquire a title in fee simple.

VOL. III.                     A                     13

6. Where, by the terms of a conveyance to a corporation, the grantees are restricted in the use of the estate conveyed, they are nevertheless considered as owners in fee of the land while their estate continues; and although they may have no right to use the land for any other purpose than that expressed in the grant, yet they have the right to prevent any other person from using either the land, or the incidents to it, for any purpose whatever.

7. The rights of the landholder under water are mere incidents to the ownership of the adjoining shore, and, as such incidents, they pass with the grant of the land.

8. Where a corporation become shore-owners, with the right to use the land for a particular purpose only, they have the right to prevent any other person from building docks and wharves in front of their land, whether *they* have the right to build such docks and wharves or not.

This cause came before the court on a *certiorari* to review the proceedings of the board of chosen freeholders of the county of Hudson, in granting a license to Albert N. Brown to build a wharf on the shore of New York bay. The facts are fully stated in the opinions delivered in this court.

The cause was argued at February Term, 1857, before the CHIEF JUSTICE and Justices POTTS, OGDEN, and VREDENBURGH.

*Frelinghuysen* and *Bradley*, for the plaintiff in *certiorari*, insisted that the Morris Canal and Banking Company were the shore-owners; that their deed gave them an absolute title to the land, and that the title thereby acquired gave them the right to build docks and wharves, and to exercise all other rights incident to shore ownership.

Where compensation is made for land taken by a corporation, it is for the fee: the legislature can grant the right to take the fee.

Even admitting that the land was to be used for canal purposes, yet the company acquired the right of adjacency to the sea and all incidents growing out of that right, and had an interest in excluding others from exercising any rights and privileges incident to shore ownership; and that no person, except an owner of the shore line, had a right

State v. Brown.

to dock or wharf out. They cited *Nix. Dig.* 871, § 1 ; 4 *Kent* 9, 10 ; *Baker* v. *Johnson,* 2 *Hill* 342 ; 9 *Howard* 184 ; *Heyward* v. *Mayor, &c.,* 3 *Seld.* 314 ; *Rexford* v. *Knight,* 15 *Barb.* 627 ; *Same case,* 1 *Kernan* 308.

*Scudder* and *Zabriskie,* for defendant.

Unless the Morris Canal and Banking Company had the right to a license to build docks and wharves, they could not interfere to prevent others. Their deed only conveyed to them the land for canal purposes, and did not convey any water rights.

The wharf act contemplates a title in fee, and no person, except an owner in fee, can obtain a license to build a wharf: the canal company only acquired a freehold interest for a particular purpose, and the right to build wharves did not conflict with the franchises of the company.

The power of a corporation to hold land must be limited to the purposes of the grant ; and to give the company the right to build docks and wharves would be to give them additional powers.

The value of water rights incident to shore ownership was never considered in assessing damages ; and those rights, and all others not necessary to the exercise of the franchises granted to the company, remained in the owner of the land, and now belong to Brown. They cited *Nix. Dig.* 138, 871 ; *Verplanck* v. *City of New York,* 2 *Edw. Ch. R.* 220 ; *Associates, &c.,* v. *Jersey City,* 4 *Halst. Ch. R.* 715 ; *Dickinson* v. *Codwise, Sandf. Ch. R.* 214; *Angell on Tide Waters* (ed. 1841) 244–5 ; 4 *Cruise Dig., tit.* 32, c. 21, § 79 ; *Greenleaf's Cruise,* §§ 82, 83 ; *State* v. *Newark,* 1 *Dutcher* 315 ; *Perrine* v. *Canal Co.,* 9 *Howard* 172 ; *Bell* v. *Gough,* 3 *Zab.* 624.

THE CHIEF JUSTICE. The board of chosen freeholders of the county of Hudson granted to Albert N. Brown a license to build a dock, wharf, or pier, in front of a tract

State v. Brown.

of land claimed by said Brown, to extend into New York bay, from high water mark to a point two hundred feet beyond ordinary low water mark. The object of this *certiorari* is to test the validity of the license so granted. The proceedings were instituted, and the license granted, under the provisions of the act entitled " An act to authorize the owners of lands upon tide waters to build wharves in front of the same." *Nix. Dig.* 871.

By the second section of the act, it is enacted that it shall be lawful for the owners of lands, situate along or upon tide waters, to build docks, wharves, and piers in front of their lands beyond the limits of ordinary low water, in such manner as not to hinder, interefere with, or impair the public right of navigation, upon license obtained for that purpose, as hereinafter provided. The third and fourth sections of the act prescribe the mode of proceeding to obtain the license. The fifth section provides for the recording of the license, and enacts that, when so recorded and delivered, it shall authorize and empower the applicant to erect the dock, wharf, or pier at any time within five years from the date thereof; and the said dock, wharf, or pier, or so much thereof as shall be executed within said five years, shall be vested in said shore-owner, in the same manner, for the same estate, and with the same limitations over, in remainder or otherwise, as the lands along said tide waters in front of which the same were made may be ; and such license shall not be assignable, except with and as appurtenant to said lands, and shall pass by sale of said lands, as appurtenant thereto.

The only question presented for the consideration of the court is, whether Albert N. Brown, to whom the license is granted, is a shore-owner, and, as such, authorized to receive the license under the provisions of the act.

The legislature have left no room for doubt as to the precise meaning of the terms employed in the act. By the eleventh section, it is declared that the term shore, in the act, shall be construed to mean the land between the

limits of ordinary high and low water; the term shore line, to mean the edge of the water at ordinary high water; and the term shore-owner, to mean the owner of the lands above and adjoining the shore line. The owner of lands, therefore, to whom alone such license can be granted, must be the owner of lands above and adjoining the edge of the water at ordinary high water. Is Albert N. Brown such owner? Is that fact proved?

In support of his claim, he exhibits a deed from Jacob M. Merseles and wife to himself, bearing date on the first of August, 1854, for a tract of twenty-nine acres and eighty-two rods, more or less, bounding on the waters of New York bay. The boundaries of the tract are in part described as running " to the waters of New York bay; thence along the New York bay 775 feet, more or less." The deed excepts out of the tract, as described, " certain lands mentioned and described in a deed, made by Jacob Merseles and Letty, his wife, and Merseles J. Merseles and Susanna, his wife, to the Morris Canal and Banking Company, bearing date on the second of February, 1835. The deed also purports to convey to the grantee, Albert N. Brown, all the right of the grantors to the lands under water, on the southerly side of the said tract and south of the Morris canal, to the middle of New York bay, or as far as the right of the grantors extends. This claim obviously cannot affect the question now under consideration.

Whether this deed vests in the grantee the ownership of land upon tide waters, and constitutes him a shore-owner within the contemplation of the act, will depend, it is obvious, entirely upon the description of the land previously conveyed to the Morris Canal and Banking Company, which is excepted out of the grant. By reference to that deed, it appears that the land granted to the Morris Canal and Banking Company is described as follows, viz., beginning on the line of land of Robert Thompson, where the same is intersected by the route of the

Morris canal, and running northwardly, as said canal runs, according to the courses and distance marked on the said map, survey, and field-book of said canal, filed in the clerk's office of the county of Bergen, to land of George Vreeland, the same being Lot No. 38 on said survey, and *is estimated to contain two acres and thirty-one hun-dredths of an acre,* strict measure; the said lot lies in the vicinity of, and on the margin of New York bay, between lands of Robert Thompson and George Vreeland, as by reference to said map, survey, and field-book will more fully appear. The land thus conveyed to the canal com-pany, and which is excepted out of the grant to Brown, is described as lying in the vicinity of, and on the mar-gin of New York bay, terms clearly importing that it bounded on the bay. It extends across the entire front of Brown's tract. An inspection of the copies of the map and field-book, exhibited to the court, confirm the general description in the deed to the canal company. The canal is there represented and described as bounding on New York bay throughout nearly its entire course over the land of Mer-seles.

The case admits that the map will show that the larger portion of the outer or sea wall of the canal is below high water mark. For a small distance, the sea wall is above high water mark, and marshy lands intervene between the sea wall of the canal and high water mark. By one of the exhibits in the cause, it appears that the canal, as actually located, does not precisely correspond with the description in the field-book on file in the clerk's office; but there is no evidence that these variations will at all affect the material description in the deed, that the land conveyed was on the margin of New York bay. That such was the understanding of the parties, and the contempora-neous construction given to this deed, is manifest from the description of the tract now owned by Brown, con-tained in the deed to his grantor. This deed bears date on the twenty-first of June, 1838, within three years after

State v. Brown.

the deed to the canal company, and describes the tract as adjoining the Morris canal on the east, as starting at a stake and running thence a northerly course along the canal, and after running the several boundary lines of the tract, thence to the said canal, the place of starting. This description makes the canal, not the New York bay, the eastern boundary of the farm. It includes no land east of the canal, and corresponds with the description in the deed to the canal company, that the land thereby conveyed was on the margin of the bay. In the absence of all conflicting testimony, the documentary evidence establishes the fact that the land conveyed to the canal company was upon the bay, and adjoined the shore line; that the canal, as located and constructed for nearly the whole distance across Brown's farm, is upon that line; that the sea wall of the canal now is, and always since its construction has been, washed by ordinary high tide, and that, consequently, the land conveyed to and owned by the canal company lies between the shore line and the lands of Brown; that Brown's deed carried him not to the bay shore, but to the canal, leaving the width of the canal, with its banks, between him and the shore line. It is not incumbent on the plaintiff in *certiorari* to show negatively that Brown is not the shore-owner. The fact of his ownership is to be shown affirmatively. It is the ground upon which, alone, the license, and the right to grant the license, rests; and if his right of property in the shore be not proved to exist co-extensive with the extent of the license to erect the wharf, the license is invalid. If this be so, it seems clear that Brown is not a shore-owner within the meaning of the act, and not entitled to a license.

But the material question before the court, and upon which this controversy mainly depends, is whether, admitting that the canal is between the land of the plaintiff and the shore line, the canal company have such title in the land as deprives the land-owner of the right to build a wharf in front on his farm.

By the deed to the canal company the land is conveyed to them, their successors and assigns, together with all and singular the waters, profits, privileges, and advantages, with the appurtenances to the same belonging or in any wise appertaining; also, all the estate, rights, title, interest, claim, and demand whatsoever of the party of the first part of, in, and to the same, and to every part and parcel thereof; to have and to hold all and singular the above-described tract or parcel of land and premises, with the appurtenances, unto the said party of the second part, their successors and assigns, to the only proper use, benefit, and behoof of the said party of the second part, their successors and assigns, *as long as used for a canal.* There is no reservation in the deed. It conveys all the right, title, and interest of the grantors in the land and its appurtenances for the term specified in the grant, to wit, "*as long as used for said canal.*"

By the terms of the conveyance the grantees take a qualified fee, liable to be defeated whenever they cease to use the land for the purpose specified in the grant. 1 *Inst.* 1, *b.* 27 *a;* 1 *Cruise* 79, *tit.* 1, § 82; 2 *Bl. Com.* 110.

Yet while the estate continues, and until the qualification upon which it is limited is at an end, the grantee has the same rights and privileges over his estate as if it were a fee simple. *Plowden* 857; 1 *Cruise,* 52, *tit.* 1, § 86.

The corporation, as such, have an undoubted right to take a conveyance in fee. The charter contains no limitation on this point. The sixth section empowers them to acquire land by deed or gift, without limitation in point of estate. The twenty-sixth section provides for the operations and privileges of the company for one hundred and fifty years, and that then the canal and its appurtenances shall become the property of the state. However the corporation may be restricted in the use of their estate, they are nevertheless owners in fee of the land while their estate continues. At the time of the license granted to Brown, the estate in this land con-

State v. Brown.

tinued in the canal company. It was then used for the purposes of a canal, and may continue to be so used forever. It is not necessary to the enjoyment of the right of the shore-owner to erect a wharf in front of his land that he should be the owner of an unqualified estate in fee; on the contrary, the statute provides that the docks, wharves, or piers erected in pursuance of the act shall be vested in the shore-owner, in the same manner, for the same estate, and with the same limitations over in remainder, or otherwise, as the lands along said tide waters in front of which the same were made may be. How, then, can the applicant for license bring himself within the provisions of the statute, and claim to be a shore-owner, when in fact the canal company own a strip of land between him and the shore line? This seems to me decisive against the authority of the freeholders to grant the license to Brown, inasmuch as, by the terms of the statute, their authority is limited to a grant of license to the shore-owner. But it is objected that the company, by their charter, could only acquire the title to land necessary to construct their canal and carry out the purposes of their incorporation, and that they could neither, by purchase nor condemnation, acquire title to the rights of the landholder under water.

The rights of the landholder under water, whatever they may have been, were mere incidents of the ownership of the adjoining shore, held by permission of, and subject to the control of the state. They passed with the grant of the land, as incidents of ownership. The restriction of the power of the company to use their rights, admitting such limitations to exist, is no limitation of the power of the company *to take* the rights. Nor, because the company cannot use them, does it follow that they exist elsewhere. In Barnet *v.* Johnson, it was held that there were uses to which the company could not apply lands acquired for the use of their canal. But it was not held that their ownership was limited, or that the adja-

cent owners possessed the rights which the company them-
selves could not exercise.

It is further objected, that if the company cannot exercise
these rights themselves, they have no interest in contesting
the claims of another, and cannot be heard upon the applica-
tion. If these rights are incidents of the ownership of the
shore, if the title to them is in the corporation, they surely
have an interest in defending them. If this company can-
not erect dwellings upon their canal, they may exclude others
from doing so. If they may not, as a corporation, carry
on the business of mining upon the land, they may ex-
clude others from doing it. They have an interest in pro-
tecting all the incidents of their rights of property. They
have, moreover, a direct and immediate interest in having
free access to the sea, and in excluding all others from ob-
structing it.

Without intending to intimate the least expression of
opinion upon the question whether the canal company
may exercise the right of building wharves in front of
this land, I am clearly of opinion that the grant of license
for this purpose, by the board of freeholders to another
person, was unauthorized by the statute, and must be set
aside.

Justices OGDEN and VREDENBURGH concurred.

POTTS, J., (dissenting.) This *certiorari* is brought to re-
view the proceedings of the board of chosen freeholders
of the county of Hudson, in granting a license to Albert N.
Brown to build a dock, wharf, and pier, to extend beyond
the limits of ordinary low water mark into New York bay,
commencing at a point on the most northeasterly part of a
tract of about 45.22 acres, in the township of Bergen, in
said county, of which said Brown claims to be the owner
in fee, where the division line between the lands of
George Vreeland and said tract terminates at high water
mark; and from thence running south, $26\frac{1}{2}$ degrees east,

along the continuation of said line, to a point 200 feet beyond ordinary low water mark; thence southwesterly 770 feet, more or less, to a point where the same would intersect the line between the lands of said Brown and Stephen Vreeland and wife, extended in the course of the said line into New York bay; and thence along the line between the lands of said Brown and said Stephen Vreeland and wife, north, 26½ degrees west, to high water mark, which dock, wharf or pier will be 770 feet in length, more or less, and extended as much as 200 feet beyond low water mark.

This license was granted under and by virtue of the provisions of an act to authorize the owners of land upon tide waters to build wharves in front of the same, approved March 18th, 1851. *Nix. Dig.* 871. This act provides that it shall be lawful for the owners of lands situate along and upon tide waters to build docks or wharves upon the shore in front of their lands, and in any other way to improve the same, and when so built upon or improved, to appropriate the same to their own exclusive use; that such docks, wharves and piers may be extended beyond the limits of ordinary low water, in such manner as not to hinder or impair the public right of navigation, upon license obtained, as directed by the act. The act provides further, that neither the act nor any license granted by virtue thereof, shall authorize any shore-owner to extend any wharf or other improvement over lands on the shore or under water beyond low water mark, the title to which, or any easement therein, by grant from this state or otherwise, may be vested in any other person than such shore-owner; and the board of chosen freeholders of the county wherein the same may lie may require any wharf so built beyond low water mark, or any part thereof, to be kept as a public wharf, open to all persons whatever, under such regulations and at such reasonable rates of wharfage as they may direct; and the act declares that the term shore shall be construed to

mean the land between the limits of ordinary high and low water; the term shore line to mean the edge of the water at ordinary high water; and the term shore-owner to mean the owner of the land above and adjoining the shore line.

The Morris Canal and Banking Company, who prosecute this *certiorari*, assign, as reasons why the license granted to Brown should be revoked and set aside—1, that they, the said canal and banking company, are the shore-owners; and 2, that Brown has no legal title to the shore, and therefore has no right to the license. These are the questions to be examined.

I. Then has the company the title to the shore? do they own the land above and adjoining the shore? are they the shore-owners within the true meaning and construction of the statute? If they are, then it follows, of course, that the board of chosen freeholders erred in granting the license in question to Brown, the defendant in *certiorari*.

The Morris Canal and Banking Company claim title in this wise; they were authorized, by their acts of incorporation, to construct a canal from the waters of the Delaware to the waters of the Hudson, with the usual powers to take land for the purpose by purchase or appraisement, and proceeded accordingly, in 1834, to survey and locate their route from the Passaic to the Hudson, and had three commissioners appointed to appraise the value of the lands required, and assess the damages to the land-owners. The route of the land was located partly along the margin of New York bay through the land in question, then owned by Jacob Merseles and Merseles J. Merseles and their wives, to its *terminus* at Jersey City. On the 15th August, 1834, the company and these parties, together with certain other land-owners, entered into an agreement under seal, whereby it was agreed to ascertain and settle, by amicable arrangement by arbitrators, the *value* of the lands required to be taken *for the uses of the*

*company*, and the damages, &c.; and they agreed to submit the matter to the three appraisers already appointed and two resident citizens of the county, who where agreed upon. They were "to ascertain and determine the compensation and damages which each of the landholders and owners and proprietors of the said lands shall receive for *the lands occupied by the said canal*, and the damages *incidental to* and *caused and to be caused by the location and construction of the said canal."* The said arbitrators, or a majority of them, were forthwith to proceed "to view the several lots or tracts of land intersected or taken and occupied by the said canal between the eastern shore of the Passaic river and the bay of New York," and from their view, &c., to "make an award, assessment, and appraisement of the value of the land taken from each of the said several lots, and of the damages which shall be done to the same, and which shall be paid to the owners of the said lots by reason of the construction of the said canal and its various works," &c., which award was to be conclusive. The canal company were to have the right to deposit any surplus earth, &c., *upon the adjacent lands* occupying *no more* of the adjacent lands than might be reasonably necessary for that purpose, but *the title thereto to remain in the landholders;* and upon performance by the company, the land-owners agreed "to convey to the said. company, *the land taken as aforesaid,* to be held by the company *as long as the same shall be used for the purposes of the canal;"* and that the company should thereupon "take immediate possession thereof, and hold the same *for the uses and purposes of the canal, not including in such conveyance, however, the adjacent lands to be occupied as aforesaid in depositing the surplus earth,"* &c.

On the 19th September, 1834, the arbitrators made their award under the above submission, giving for the land taken from the lot in question, 2.31 acres, $231, and for incidental damages $1769. The money so awarded was paid, and for which Jacob and Merseles J. Merseles gave

.the following receipt : " Received from the Morris Canal and Banking Company $2000, being in full for the amount awarded us by the arbitrators, under the submission hereto annexed, for land and incidental damages by reason of the Morris canal *passing through our land,* as appears by the preceding award of the arbitrators."

On the 2d February, 1835, the said Jacob and Merseles J. Merseles and their wives made, executed, and delivered to the Morris Canal Company their deed of conveyance, for the consideration of $231, of the land so awarded by the arbitrators.   The deed is in the ordinary form of a .deed of bargain and sale to the company, their successors and assigns, *as long as used for said canal;* and describes the land conveyed as "situate, lying, and being in the township of Bergen, in the county of Bergen, and State of New Jersey, beginning on the line of land of Robert Thompson, where the same is intersected by the route of the Morris canal, and running northwardly, as said canal runs, according to the course and distance marked on the said map, survey, and field-book of said canal, filed in the clerk's office of the county of Bergen, to land of George Vreeland, the same being lot No. 38 on said survey, and is estimated to contain 2.31 acres *strict measure;* the said lot lies *in the vicinity of and on the margin of New York bay,* between lands of Robert Thompson and George Vreeland," &c.

The canal company entered into possession of the land so conveyed, and have constructed their canal over it, and it is conceded that " the larger portion of *the outer or sea wall of the canal is below high water mark ;*" and that "for a small distance the sea wall is above high water mark, and marshy land intervenes between the sea wall of the canal and high water mark."

In examining the character and extent of the title which passed by this deed to the Morris Canal and Banking Company, we are not restricted to the words of the deed alone.  The deed is to be construed in reference

to the charter powers of the company, the proceedings to take the land by condemnation, the agreement of submission, and the award of which the deed was but the execution. These are of the *res gestæ*. They are parts of the same transaction—the acquisition of the land. The transaction originated in the power of the company to take the land, progressed by the exercise of that power, and the deed was but the form in which the power was consummated. These, therefore, legitimately belong to the consideration of the question as to what was the intention of the parties, and what are the legal effect and incidents of the grant.

The state, in the exercise of the right of eminent domain, which gives to the legislature the control of private property for public uses, and for public uses only, had delegated to this company, in consideration of the great public benefits the work it proposed to construct would secure, the power to take the lands of private citizens by condemnation. The purpose was the construction of a canal or artificial navigation, which was to be and remain forever a public highway. The lands authorized to be taken were such, and such only, as were *necessary* for the purpose of the canal and its appendages. This was the extent of the constitutional power; and the legislative delegation of authority to take private property for public uses is always to be construed accordingly. The charter of the company, in terms, thus limits the right. It requires—first, a survey and specific location of the works; then an offer of compensation : and, if the parties cannot agree, then a particular survey and map is to be made of such lands, waters, and streams as, in the estimation of the president and directors of the company, are requisite to be taken for the uses of the canal, and these are to be exhibited to a justice of the Supreme Court, accompanied by the oath or affirmation of one of the engineers employed by said company, that *the premises therein described* are required to be occupied by the company for the pur-

pose of carrying into effect the object set forth by the act, and *are not more than is requisite for the said uses,* before commissioners can be appointed to appraise the value and damages. And it is the premises *so appropriated, described, and appraised,* alone, that vests in the company. The 27th section of the charter is very specific. It declares that every part of the act shall be so construed as that the said corporation shall not be authorized to take or appropriate to the use of said canal, or under color or pretence that the same are necessary therefor, any lands, waters, or streams of water, but such only as are actually necessary for the erection and use of said canal for the purposes of navigation only, and its necessary towing paths and works, as specified in the 5th section. It is very clear, therefore, that whether we look to the constitutional powers of the legislature to grant, or to the express terms of the grant itself, the company were only authorized to take by condemnation such lands as, by specific designation and proof, were ascertained to be necessary for the use of constructing the canal and its necessary appendages.

The constitutional power to take private property for public use, implies the limitation that nothing more can be taken than is strictly required for the use. The private interest of the individual is never to be sacrificed to a greater extent that is necessary to secure a public object of adequate importance. This is now held to be the rule in England. *Angell on Highways* 57, § 80. And the same author, speaking of the practice in the United States, *p.* 60, § 83, says, " It is very obvious that in taking private property, under the express authority of government, for public use, no more should be taken than is demandable by the exigencies of the community ; and the least possible private injury in so doing should be committed. If the charter of a navigation company authorize the entering upon lands adjoining the works to be constructed, and taking materials therefrom, no more can be taken than as an *incident* to the promotion of what is intended by the

charter. So, the presumption is, in laying out a common highway over the soil owned by an individual, that such individual *retains every right except the public easement.* And see 2 *Kent's Com.* 339. And so, too, in the case of *Varick* v. *Smith, on appeal,* 9 *Paige Ch. R.* 561, it was said by the court that " the government has the power, under the constitution, to appropriate the private property of the citizen *just so far, and no farther,* than is necessary for the purpose and object of the appropriation." And " when such purpose is accomplished, the right of the state is exhausted, and *the whole* of *the residue* of the property, whatever it may be, *belongs to the citizen.*"

Such, I apprehend, is the correct exposition of the doctrine we are considering. The public necessity is the foundation of the right, and with that necessity it begins and ends. To hold that an incorporated company, authorized to construct a work of public utility, may go beyond this limit, and appropriate, not only such private property as is necessary to enable them to construct their work, but such as would be merely useful and advantageous in a pecuniary point of view to the stockholder, would be an unwarrantable and dangerous perversion of the doctrine. It would be using it as a pretext for appropriating the private property of one citizen to the purpose of increasing the emoluments of other citizens, irrespective of the strict public necessity. .

That it was the intention of the parties to convey and acquire precisely what the company were proceeding to take by condemnation, is manifest. The recitals in the agreement and submission show that the company had surveyed and located the route of their canal over the premises; had specifically designated the lands necessary for their use by description; filed the field-book, map, and surveys in the clerk's office, and had applied for and obtained the appointment of commissioners to appraise the value of the land and damages, having made, as we must presume, the necessary proof by the oath of one of

VOL. III.　　　　　　　B

their engineers, that the premises described were required by the company for the purpose of the construction of the canal. The agreement and submission further recites that the appraisers so appointed were convened, and prepared to enter on their duties; that, at this juncture of time, it was suggested that the land-owners and the company were desirous to settle by arbitration, not *what* lands or rights were to be conveyed, but the *value of the lands so required to be taken* for the uses of the company, and the damages, &c. The property rights to be surrendered to the company had been already ascertained and fixed under the provisions of the charter. The compensation alone remained to be ascertained, and *this* was to be referred to arbitration.

The parties, in preparing this agreement and submission, appear to have been extremely careful to designate the precise subject matter with which they were dealing— the property rights to be parted with by one party, and acquired by the other, and for which compensation was to be awarded. They describe it as "the lands through which the said extended canal is *located;*" "the lands occupied by the said canal, and the damages incidental to and to be caused by the location and construction of the said canal." The appraisers are to view "the several lots or tracts of land intersected, or taken and occupied by the said canal," and to appraise "the value of the *land taken* from each of the said several lots, and of the damages which shall be done to the same." When the sum awarded for "the land taken and occupied and damages done to each particular lot" are paid, the company are to have authority to enter and construct their canal, "doing no unnecessary damage or injury to the adjacent lands;" and to occupy the adjacent lands for the purpose of depositing the surplus earth, "but the title thereto to remain in the landholders." And by the sixth article of the submission, it is agreed that, when the amount awarded is paid or tendered, the land-owners will convey

to the company the *land taken as aforesaid,* to be held by the company so long as the same shall be used for the purposes of the canal—not including in said conveyance, however, the adjacent lands to be occupied, as aforesaid, in depositing the surplus earth, &c.

Then the award is made in pursuance of the agreement and submission. It awards $231 to Merseles for precisely two acres and thirty-one hundredths of land, being the land actually occupied by the canal, and $1769 for incidental damages. The arbitrators say, in their award, that they proceeded " to view the several lots or tracts of land intersected or taken *and occupied* by the said canal," and upon this view appraised the value of the land taken, &c., and the damages which shall be done to the same, and which shall be paid to the owners, &c., by reason of the construction of the said extended canal, &c. And the receipt given to the company, and produced by them, says the amount is that awarded them under the submission "for land and incidental damages by reason of the Morris canal *passing through* our land."

From this view of the proceedings had, and which were consummated by the deed in question conveying the two acres and thirty-one hundredths, strict measure, for as long as the same should be used by the canal, it is entirely clear that it never entered into the contemplation of the parties that they were dealing with any other property rights than those which the company were proceeding to acquire by condemnation under the provisions of their charter. But as the title by condemnation could only be acquired by a strict pursuance of the delegated power, the substitution of the agreement, submission, and award, as the mode of ascertaining the value of the land and damages, instead of the commission and appraisement provided for by the charter, rendered it necessary to adopt the form of passing the title by deed. Yet it was but the mere formal mode adopted by the parties of giving effect, by their own act, to the charter power of

condemnation, the operation of which had been intercepted,
by the agreement.

Then what the company acquired by force of this deed
of conveyance was, strictly, such an estate or interest in
the land as they would have acquired by condemnation,
had they pursued the mode prescribed by their charter to
that end. They took neither more nor less than this.
Their title was limited, therefore, to the narrow strip of
land specifically described and actually used in the con-
struction of the canal and its towing paths. They took
it, too, limited to a particular and specific use, that of con-
structing and maintaining their canal on and over it for
purposes of navigation, and their estate in it was to ter-
minate with the use. In one sense, it is true they became
shore-owners. The strip occupied by them, embracing
the two acres and thirty-one hundredths, it is admitted
lies along the shore of the bay of New York, and the
larger portion of the outer or sea wall of their canal is
below high water mark. But the species of limited estate
they acquired amounted, practically, to nothing more than
*an easement or right of way.* Such was the opinion of the
Chancellor in *Willink* v. *The same Co.*, 3 *Green's Ch. Rep.*
403; and such an interest in lands cannot possibly be
construed to carry with it the legal rights of riparian owners
—the right to wharf out and otherwise reclaim and im-
prove the adjoining shore, the use of the shore for fisheries
and all other lawful purposes, not obstructing the public
right of navigation. These remain as appurtenances
to the estate out of which the limited grant to the com-
pany was carved. They constitute part of the intrinsic
value of that estate; they have never been divested
from the owners of the upland; the owners of the origi-
nal estate still have the right of fishing and ferry, and
every other right which at common law attached as ap-
purtenances to the land consistent with the enjoyment of
the estate granted to the company. These were never
sought to be condemned to the use of the canal company;

State v. Brown.

they were not within the contemplation of the parties, or the terms of the agreement and submission, the award, or the deed which executed the award.

The statute of 1851 must be construed as declaratory of the common law; for it is not within the constitutional powers of the legislature to give or take away the vested property rights of the citizen or the public for purposes of mere private emolument. Its object was to define and settle the extent of the rights of which it treated, and which had become the subject of doubt and litigation, and to prescribe the mode of their exercise and enjoyment; for in many instances these riparian rights had become very valuable—more valuable, indeed, than the upland to which they were appurtenant. Considering this, therefore, as a mere declaratory act, it in no wise affects the rights of these parties, so far as they are involved in this controversy.

Taking it to be established, that the deed of conveyance passed only such title as the company would have acquired by condemnation, the case seems very free from difficulty. The Morris Canal and Banking Company have undoubtedly the power in their charter to take, not only the land necessary for the erection and construction of their canal and towing-paths, but land for all the necessary appendages to their work, by condemnation; but it can only be taken by a strict pursuance of the forms prescribed by their charter, and one of these requires that they specify particularly the land required, and show, by proper proof, that it is so necessary, and the object for which it is to be used. Without this they cannot proceed to acquire the title. There is nothing in the case to show, nor is it pretended, that the company, in the case before us, designated any land of Merseles, or sought to appropriate any of his rights outside of the strip in question, except only the privilege of depositing their surplus earth on the adjoining land, without interfering with the title. The proceedings are silent on the subject of docks,

wharves, and piers, for which, it is now argued, the shore-rights are important to them.   If the company had required, as they now insist they do, these shore-rights for the purpose of erecting wharves, docks, and piers, as auxiliary and necessary to the purposes of their legitimate business, they should have taken the proper steps to acquire them by condemnation.   They should have described specifically the quantity and location of the land below high water mark which they required, and the uses for which it was required, or they should have embraced it in their agreement and submission, had the value appraised, and stipulated for and obtained a conveyance or release.

There is no foundation in fact for the argument that the $1769 awarded as damages, were given as the value of the riparian rights of the land-owner : on the contrary, it is manifest that the damages were awarded, not for the rights themselves, but for the inconvenience of having the canal interposed between the upland and the shore, and the consequent difficulty presented to the enjoyment of the riparian rights by the land-owner.   This was the extent of the power the commissioners would have had under the charter, ( *Vanschoick* v. *Delaware and Raritan Canal Co.*, *Spencer* 254,) and the agreement and submission did not enlarge the power.

The cases that have been cited from the State of New York rest upon their peculiar legislation, and cannot be considered as of authority upon the question now before the court.

The only remaining question is as to the title of the defendant, Albert P. Brown, to the shore in question. But I apprehend it is not necessary to consider that question here.   The Morris Canal and Banking Company cannot raise that question in this case.   If they have no title or right, they are not in a situation to complain.   That controversy, if there be one, it will be time enough to examine when the proper parties bring it in form before

the court. A third party cannot be permitted to come into court and litigate questions of title in dispute among other parties. If the canal company can show that the license granted interferes with any rights they have acquired, or in the progress of the contemplated improvements to be made under the license, they are injured, the law will furnish a remedy.

In my opinion, the *certiorari* should be dismissed.

REVERSED, 3 *Dutch.* 13. *Cited in* McKelway v. Seymour, 5 *Dutch.* 329; *Hoboken Land and Imp. Co.* v. *Mayor, &c., of City of Hoboken,* 7 *Vr.* 550; *Morris Canal and Banking Co.* v. *Central R. R. Co.,* 1 *C. E. Gr.* 438.